**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220330-U

Order filed

_

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| LEAH E. STEINHAUSER-WALSH, | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| Petitioner-Appellee, | ) | Du Page County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-22-0330 |
| | ) | Circuit No. 22-OP-818 |
| | ) | |
| JASON PENICK, | ) | Honorable |
| | ) | Robert G. Gibson, |
| Respondent-Appellant. | ) | Judge, Presiding. |

_

JUSTICE PETERSON delivered the judgment of the court.
Presiding Justice Holdridge and Justice McDade concurred in the judgment.

_

**ORDER**

¶ 1     *Held*:  The circuit court's decision to issue a stalking no contact order was against the manifest weight of the evidence.

¶ 2     Respondent, Jason Penick, appeals the Du Page County circuit court's issuance of a stalking no contact order. Penick argues that the court erred by issuing the order because the

evidence failed to establish a course of conduct, which is necessary for a finding of stalking. We vacate the stalking no contact order.

¶ 3                                    I. BACKGROUND

¶ 4          On June 11, 2022, petitioner, Leah E. Steinhauser-Walsh, filed a petition seeking a stalking no contact order against respondent, Jason Penick, pursuant to the Stalking No Contact Order Act (Act). 740 ILCS 21/1 *et seq.* (West 2022). The court denied an emergency order and set the matter for a plenary order hearing.

¶ 5          Steinhauser-Walsh testified that she was a teacher. Penick's daughter was in her class. During the first week of school, in September[1] 2021 at approximately 3:35 p.m., Steinhauser-Walsh was called by the school office and informed a parent needed to speak with her. She walked outside the school and saw Penick and his daughter. She asked what Penick needed. Steinhauser-Walsh stated that Penick "proceeded to get very close to me, and start[ed] really questioning me that my daughter had told me that you strangled or twisted her neck. And then got into my face very close *** and screamed at me, you will never touch her again. Do you hear me." Steinhauser-Walsh stepped back because she was frightened and intimidated. Steinhauser-Walsh explained to Penick that she was confused and did not know why he was screaming at her. Penick's daughter told Steinhauser-Walsh that she touched her neck and Steinhauser-Walsh explained that she had called the daughter's name multiple times and when she did not respond, she tapped her on the shoulder. Penick again got very close to Steinhauser-Walsh and screamed she would never touch his daughter again. Steinhauser-Walsh testified that she stepped back because she was afraid. She told Penick that the conversation was done and they needed to go into the school and speak with the principal. Penick left. Steinhauser-Walsh went to the school

---

[1]Steinhauser-Walsh initially testified that it was August, but later clarified that it was September.

2

office and advised Keeley Schmid, the principal, what had occurred. Penick had already told Schmid his version of the events. Schmid calmed Steinhauser-Walsh down. Steinhauser-Walsh was crying and afraid Penick was going to hurt her.

¶ 6 A few days later, Steinhauser-Walsh, Penick, and Schmid had a meeting. Steinhauser-Walsh attempted to explain the situation but "Penick started screaming again that [she] was lying" and hurt his daughter. Steinhauser-Walsh left the meeting because she did not feel comfortable and felt unsafe. When she left, Penick did not follow her. Steinhauser-Walsh testified that at some point Penick was told to contact Schmid directly with regard to any issues relating to his daughter, but she did not testify who told Penick that. This was done because Steinhauser-Walsh did not feel safe communicating with Penick by herself. She did not have contact with Penick again until May 2022.

¶ 7 Steinhauser-Walsh testified that in May 2022 she was squatting down to say goodbye to her students when "all of a sudden, a presence came up. I looked up, stood up, and *** Penick was in my face again, screaming, what the fuck, where is my fucking child." Penick was within five or six inches of her. Steinhauser-Walsh stood up and put her arms out. She explained that she did not hear from Penick or the school office that he was going to pick up his daughter and advised that his daughter was at daycare. Penick moved closer to her and said he "called the fucking office. Fuck." Penick then left. Steinhauser-Walsh was scared for herself and her students. The students started crying and asking why Penick was screaming at her. Steinhauser-Walsh stated that she felt threatened. She felt Penick was going to hurt her. Following this incident she spoke with Schmid and a safety officer. It was decided that a no trespass order would be given to Penick, barring him from the school campus. Steinhauser-Walsh stated that she feared for her safety if the court did not issue the no contact order. Steinhauser-Walsh has not

3

had any contact with Penick, other than in court, since the May 2022 incident. To her knowledge, since the May 2022 incident and the no trespass order was issued, Penick has not gone to the school, to Steinhauser-Walsh's house, or anywhere near Steinhauser-Walsh. Penick also had not contacted her by electronic means.

¶ 8    On cross-examination, Steinhauser-Walsh was shown an email she sent regarding the September 2021 incident. In the email she indicated that Penick invaded her personal space and that his behavior in yelling at her was inappropriate. She admitted that nothing in the email indicated that she felt she was in danger of physical harm from Penick. Penick did not "take any kind of physical action against" Steinhauser-Walsh at any time in either of the incidents. Other than one incident in September 2021 and one incident in May 2022, Steinhauser-Walsh did not have any problems with Penick.

¶ 9    Alice Iwinski testified that she was a teacher and co-worker of Steinhauser-Walsh. In May 2022 she saw Penick approach Steinhauser-Walsh. He was very aggressive and threw his hands up in the air. Penick appeared frustrated. Steinhauser-Walsh asked her to wait with her students while she went inside to the school office. Iwinski had concerns for Steinhauser-Walsh's safety. Penick did not threaten anyone but his body language when interacting with Steinhauser-Walsh was threatening. Khadisia Persaud, another teacher and co-worker of Steinhauser-Walsh, testified similarly to Iwinski.

¶ 10    Schmid testified that she had prior contact with Penick regarding incidents with staff members, wherein she explained to him that his treatment of the staff was unacceptable. Penick had approached Schmid about the September 2021 incident and explained that Steinhauser-Walsh had touched his daughter. Following the conversation with Penick, Schmid found Steinhauser-Walsh in her office. Steinhauser-Walsh was upset and explained her version of the

4

events. Steinhauser-Walsh told Schmid that Penick made her very uncomfortable and he got in her personal space. Schmid told Steinhauser-Walsh to follow up with Penick and explain her account of the interaction with his daughter. Penick called Schmid and stated he did not appreciate an email he received from Steinhauser-Walsh regarding the interaction with his daughter. Schmid then had a meeting with Steinhauser-Walsh and Penick. Steinhauser-Walsh told Schmid prior to the meeting that she was uncomfortable meeting with Penick alone. Schmid assured her that she was facilitating the meeting and for Steinhauser-Walsh to let her know if she felt uncomfortable. At the meeting, Schmidt allowed both Penick and Steinhauser-Walsh to tell their version of the events. Penick was calm initially but became aggravated when Steinhauser-Walsh was giving her version of the events. Penick raised his voice in frustration but was not screaming. Steinhauser-Walsh advised that Penick was making her uncomfortable and Penick asked what he was doing to make her feel uncomfortable. Schmid continued to try to facilitate the meeting but Steinhauser-Walsh again stated she was feeling uncomfortable. Schmid advised Steinhauser-Walsh she could leave. Steinhauser-Walsh left the meeting and Schmid continued meeting with Penick. Schmid did not feel that she was physically at risk during the meeting. Schmid did not feel that there was any threat to Steinhauser-Walsh at the meeting. Schmid stated that Penick told her that going forward his communication would be with Schmid. Schmid also advised Steinhauser-Walsh that any communications and situations should go through Schmid.

¶ 11     Schmid spoke with Steinhauser-Walsh after the May 2022 incident between Steinhauser-Walsh and Penick. Steinhauser-Walsh was visibly upset. Steinhauser-Walsh told Schmid that Penick's behavior was unacceptable, he had been given too many opportunities, and she would not be treated like that. Subsequently, Steinhauser-Walsh texted Schmid that she felt unsafe going to her car. A no trespass order was issued to Penick the next day.

5

¶ 12    Penick testified that, as to the September 2021 incident, he was approximately an arm's length away from Steinhauser-Walsh. He told Steinhauser-Walsh he did not care what happened, just not to touch his daughter again. Penick stated he did not raise his voice, at least not initially, and that if he did, it would have been after the third or fourth time telling Steinhauser-Walsh not to touch his daughter. He never moved closer to Steinhauser-Walsh and just stood there with his arms crossed. Steinhauser-Walsh told Penick that he was getting in her face and she felt threatened. Penick asked what she meant and then said never mind. Penick walked away. Penick did not threaten Steinhauser-Walsh during the conversation. He had no contact with Steinhauser-Walsh between September 2021 and May 2022. As for the May 2022 incident, Penick stated he asked Steinhauser-Walsh where his daughter was. Penick did not believe he used colorful language but he was frustrated and it was possible. Steinhauser-Walsh told Penick his daughter was waiting for the bus because she did not get a note from the school office. Penick told her that he called the school office and, at that time he may "have used the F word." Penick was not very close to Steinhauser-Walsh, probably between 10 and 15 feet from her. Penick turned around and walked away. Penick never followed Steinhauser-Walsh anywhere, threatened her, monitored her, or surveilled her.

¶ 13    The court found Steinhauser-Walsh and the witnesses to be credible. The court did not find Penick credible, as to how close he was to Steinhauser-Walsh during the May 2022 incident. The court found that Penick admitted to swearing, being angry, and confronting Steinhauser-Walsh after he was told that any inquiries regarding his daughter should go through Schmid. The court found that Steinhauser-Walsh was a victim of stalking and that Penick caused her emotional distress. The court entered a two-year stalking no contact order. Penick appeals.

¶ 14                                   II. ANALYSIS

¶ 15        Penick argues that the court's decision to issue a stalking no contact order was erroneous because the evidence at trial did not establish a course of conduct as defined in the Act.[2] Specifically, Penick argues that even accepting Steinhauser-Walsh's evidence at trial as true, she failed to establish two or more acts that would qualify as a course of conduct, which is required to establish stalking. Steinhauser-Walsh argues that although Penick asserts he did not engage in any of the enumerated acts contained in the Act, the course of conduct definition includes "engages in other contact," which encompasses Penick's contact with Steinhauser-Walsh.

¶ 16        Under the Act, " '[s]talking' means engaging in a course of conduct directed at a specific person, and he or she knows or should know that this course of conduct would cause a reasonable person to fear for his or her safety *** or suffer emotional distress." 740 ILCS 21/10 (West 2022). "Stalking behavior includes following a person, conducting surveillance of the person, appearing at the person's home, work or school, making unwanted phone calls, sending unwanted emails, unwanted messages via social media, or text messages, leaving objects for the person, vandalizing the person's property, or injuring a pet." *Id.* § 5. " 'Course of conduct' means 2 or more acts, including but not limited to acts in which a respondent *** follows, monitors, observes, surveils, or threatens a person, *** engages in other contact, or interferes with or damages a person's property or pet." *Id.* § 10. " 'Contact' includes any contact with the victim, that is initiated or continued *without the victim's consent*, or that is in disregard of the victim's expressed desire that the contact be avoided or discontinued." *Id.* The court shall issue a

_____

[2]We note that Steinhauser-Walsh argues in her brief that Penick raised multiple issues for the first time on appeal and that issues not objected to during trial or raised in a posttrial motion are forfeited. However, she fails to set forth any specific argument she believes was forfeited. As such we decline to consider this argument. See *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 29 ("A reviewing court is entitled to have issues clearly defined with *** cohesive arguments presented; this court is not a repository into which an appellant may foist the burden of argument and research.").

stalking no contact order if it finds the petitioner has been a victim of stalking. *Id.* § 80. The petitioner is required to prove stalking by a preponderance of the evidence. *Piester v. Escobar*, 2015 IL App (3d) 140457, ¶ 12. The decision to issue a stalking no contact order will only be reversed if it is against the manifest weight of the evidence. *Id.* "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Nicholson v. Wilson*, 2013 IL App (3d) 110517, ¶ 22.

¶ 17    Accepting the evidence presented by Steinhauser-Walsh as true, the record fails to establish the requisite course of conduct necessary to be considered stalking. First, the Act requires that the contact at issue be nonconsensual. See *Piester*, 2015 IL App (3d) 140457, ¶ 12 ("The stalker's contact must be nonconsensual."). Further, there must be two or more stalking acts directed at the victim. Here, according to Steinhauser-Walsh's own testimony, there were only three instances of contact between her and Penick at issue. Two out of the three were consensual and terminated when she expressed the desire to discontinue the contact. Specifically, as to the September 2021 incident, she voluntarily went outside the school, approached Penick, and conversed with him. When she told him the conversation was done, he walked away. Further, there was no testimony that Penick threatened her during the encounter. Subsequently, Steinhauser-Walsh voluntarily agreed to meet with Penick and Schmid. When she voiced her discomfort, she was allowed to leave the meeting and Penick did not follow her. Because both contacts in September 2021 were consensual and there was no evidence that Penick threatened Steinhauser-Walsh during either contact, we cannot say that either constitutes an "act" of stalking that could be considered as part of a "course of conduct" under the Act. We agree that the May 2022 contact was nonconsensual because after the meeting with principal Schmid,

8

Penick knew he was not to communicate directly with Steinhauser-Walsh going forward. Thus, such contact could be considered a stalking "act," however, it was the only act as defined by the statute. Because the statutory definition of "course of conduct" requires at least two acts, and stalking requires a course of conduct, we conclude that the court's finding that Steinhauser-Walsh was a victim of stalking is against the manifest weight of the evidence. A stalking no contact order is a creature of statute and in order to obtain such an order, the statutory elements of stalking must be established. Here, although Penick's conduct was arguably unreasonable and unruly, the requisite statutory elements of stalking were simply not established. Therefore, the court erred by issuing the stalking no contact order. Accordingly, we vacate that order. In light of our disposition, we need not address Penick's remaining arguments.

¶ 18                                    III. CONCLUSION

¶ 19            The judgment of the circuit court of Du Page County is vacated.

¶ 20            Judgment vacated.

¶ 21